2011-1145 ILLUMINA v. AFFYMETRIX Mr. Castanius Thank you, Judge Newman, and may it please the Court. The central dispute in this case involves the District Court's construction of the term substrate in the claims. Through a combination of its Markman ruling and its court narrowed the meaning of substrate in a way that's inconsistent with the specification and its full context, which plainly states that the term is entitled to a broad and inclusive meaning, particularly because beads or microspheres need not be used in the invention. The District Court also misconstrued two other claim terms, we believe, bioactive agents and discrete sites. JUSTICE GINSBURG Well, this is an odd case for claim construction, is it not? Because the District Court didn't make it up or restate in her own words what she thought the claim meant. What she did was take the definition precisely from the specification, the definition that wasn't labeled definition, but it uses those words, is meant, what is meant by this term. I'm having a hard time getting around that. MR. CASTANIUS Well, I think I could help you get around that, Judge Prost. It's not a definition. It's at least not a definition of the term substrate as it's used in the claims. If you look at the language that was seized upon by the District Court as a definition, it's this language that appears at column seven of the patents. By substrate or solid support or other grammatical equivalents herein, all those we say are okay as the construction of substrate, is meant any material. So what is, what a person of ordinary skill reading this reasonably would see, any material, first of all, any is broad. Secondly, it's focused on the materials. It's not focused on what the meaning of substrate is. It's a matter of what the materials, the raw materials that you start with to make a substrate. And for example here, it says it's a very large number of materials. The substrates include but are not limited to, and the first one that's listed is glass, which on the summary judgment point is exactly what Affymetrix's substrates are made out of. And to make this point exactly, Judge Prost, I think if you compare this language, which was found by the District Court to be definitional, to the claims, you see where the error arose. This language in the specification says these are the raw materials and it says that it is, these are materials that can be modified. They're pre-modification materials that can be modified to contain discrete individual sites. But when you go to the language of the claims, you see that the claims call for a substrate comprising a plurality of array locations. So the claims are talking about the fully formed material, sorry, the fully formed substrate out of those raw materials. And I think if you look, for example, at this court's decisions in the case that my friend over here is most fond of referring to as the Synorg-Chem case, that case says a patentee has to clearly, deliberately, and precisely define the term. Well, here, you have two problems with that being a definition. First, as I pointed out, it's clearly pointed to the raw starting materials, which is large, almost infinite. Almost anything can be a substrate, as they pointed out, in terms of the raw materials. Well, that's what's a little odd to me about the briefing in this case, because in the one hand, you have vehemently throughout rejected or argued against the District Court's claim on the construction. But then on the question of summary judgment of infringement, that's your argument. You embrace it. I mean, you say, raw materials, are you kidding me? This is the universe. This is everything. And therefore, there shouldn't have been a summary judgment of non-infringement. I think the point is, Judge Prost, we've been very careful in our briefs to say that No, I'm sympathetic to the position you're in. I'm not suggesting that there's anything I'm bored about what we're doing. Right, and that's the obvious of it, is that we think we can win either way and get a remand on this issue. But we think that it was not an appropriate construction of the term substrate as it's used in the claims, which focuses on the substrate comprising, to take this so-called definition, which is focused on the raw materials. That's the claim construction error. But if you accept the proposition that my friend puts in his brief that says, well, we say substrate means support, and it means this other thing, and if one thing is equal to another, and it's equal to a third, then all of them are equal to each other, then we'll take this definition as it stands, but we have to understand it for what it is and what it isn't. What it is is a definition of the raw materials, in which case it's met because their substrates are made of glass. The summary judgment should have been denied in that regard. Well, that might be true if all we had was the spec, and we didn't have the language of the claims. But if you put that definition of raw materials per substrate into the claim language, which also talks about comprising a plurality of array locations, and you know the rest, then those are limitations of the claims. We're not just talking about raw materials. But I think this is... That's their view, right? Well, that is their view, but that's the problem, is that the so-called definition, which, as I've said, we don't believe is a definition at all, when you take into consideration the sense as a definition, because it's talking about appropriate for the attachment of beads in microspheres. And you have other language in the specification that makes also crystal clear that, well, we're going to use the bead microsphere embodiments as sort of the mind run of the sort of embodiments we're going to talk about. It's very clear at least three or four different locations. Beads need not be used. And then you even have claims which are drawn to... You have dependent claims which are drawn to beaded embodiments and non-bead embodiments where there's a direct coupling of the material to the substrate. So a person of ordinary skill in the art picking up this specification would not seize, in the way the district court and ethymetrics has, on the language is meant in isolation. It would read the entire context and conclude that there is not a definition of substrate, but a definition of the broad range of materials from which a substrate might be created when you're dealing with a bead embodiment. That's what that language at column 7 says. It's important to note, Judge Prost, also on that point, that the independent claims do not 29, 45, 60 in the 020 patent mention microspheres. There's a strong indication to anyone picking up the entire holistic patent document that there is not a limitation of this case either by quote definition or by this notion that that's what we claimed as the invention to beaded embodiments. And with regard to that latter point, let me just point this out. There's been another argument, which was not embraced by Judge Crabb. It's been raised by our opponents that we have defined the invention. And they, in particular, rely upon language column 5 lines 34 to 36 that starts with the words the present invention is. And this is their strongest case where we've, in a sign med way, limited these claims to column 5 and the columns and lines are exactly the same in both patents. Lines 34 to 36. It starts with the language the present invention is. And you'll see that that's where they like to say the present invention is dot dot dot. But then they leave out or deemphasize the next words. Generally based on, generally based on previous work comprising a bead based analytic chemistry system in which beads and so on and so forth. Isn't it even worse than that? I'm going to answer yes to that, but go ahead, please. Where it says by substrate or solid support is meant and actually it's defined in terms of beads. Right. And that really says that we're looking here when you're going back to that so-called definition. Well, maybe I won't answer that question, yes, but I think that's actually worse for them if that's, that's certainly what I understood your comment to mean. But it's worse because you have that other language in the patent that says beads need not be used in any of the embodiments of the invention. And then when you look at the so-called definitional language, it's only talking about the raw materials appropriate for when you have beads, which is not required. Well, it is far from consistent and it's far from clear. And the real question is how broadly to construe an inconsistent disclosure. Well, I think, I actually don't think that the entirety of the disclosure, Judge Newman, is inconsistent at all. I think that when you read the entirety of the specification informed then, excuse me, by the structure of the claims, which do not call for beads, which have dependent claims that are drawn in one case, they sort of jump off in one way to beaded microsphere embodiments, and then they jump off another way to situations where the substance is directly coupled to the substrate without an intermediary of a bead or a microsphere. You have an entire patent document that tells us that this patent is not limited to beads, that the independent claims are not limited to beads. We did not say that the invention is limited to beads. And in fact, quite the contrary, we even have drawings that show directly coupled non-beaded embodiments. If you look at figure 1B of the patent, and that's described in those very terms in column 3, lines 33 to 34. With regard to the question of whether we made this the invention in the specification, the SyMed line of cases will not support the reading that F-Metrix gives to this patent. SyMed says itself, where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent. Even though the language of the claims read without reference to the specification might be considered broad enough. Other cases that have followed SyMed, trading technology, demands a clear intention to limit the claims in the spec. The Rambis case, much the same. It says you have to read that present invention language in the light of the entire specification, as well as the prosecution history. Praxair, much to the same effect. The Pfizer versus Teva case cited in the briefs, much to the same effect. The bottom line is, a person of ordinary skill in the art picking up this patent would not say this invention is limited to beads. And it would not say that the patentee has provided a definition of substrate that can simply be plugged into the claims in the way that both F-Metrix and Judge Crabb did in this case. Unless there are further questions on the substrate issue, I'll turn it very quickly, because I'm already into my rebuttal time on the other claim construction issues. If there's to be a remand in this case, we think the court should, consistent with its practices in other cases, address these issues so that the judge can get the proper guidance on remand. First, with regard to bioactive agents. Both parties asked the court to construe a much broader term, which was said bioactive agents are directly coupled to said array locations. The court determined to only construe the term bioactive agents. We think she made roughly the same error with regard to importing a definition that was limited to beads. But in any event, as long as I think we are able to raise the issue of the broader construction of the broader term, which really focuses on the meaning of directly coupled, not the meaning of bioactive agents, that would probably be sufficient there. And then finally, much the same with regard to discrete sites. We think the court committed an error with regard to the construction of that term. There is no language in the specification, certainly none that is so clear, as to provide something like a definition or a limitation that says that discrete means contiguous. Even the dictionaries that were put forth by the parties wouldn't support that proposition. So unless the court has further questions, I'll reserve the remainder of my time for you. We'll save you rebuttal time, Mr. Castanis. Mr. Bress. Judge Newman, and may it please the court. I'm going to start off, oddly enough, agreeing with my brother on something, but to demonstrate his error. Can I ask you a question before you get into it? Of course, Judge. Is your view of the court's construction of the term substrate to require beads in all instances? No, Your Honor, and that's where I was going to start out. Oh, OK. We're on the same wave. Completely. It doesn't require beads in all instances. What it requires is that the component, and the second substrate is one of two components, either have beads or be able to be modified to have beads. And once you understand it that way, really all of the supposed inconsistencies that my brother has brought up fall away. Let me start with the notion of whether a substrate has to meet a raw material, which I think is a cornerstone of my brother's argument, as opposed to meeting the component in full, second substrate. The right place to start, of course, with any of this is to start with the claim language itself. This court has taught that many a time. But if the specification has a definition in it, and the words that are used are expressly directed to the public to a specific definition, then why shouldn't the court start there? Your Honor, I'm not trying to fight with the specification definition. I'm trying to help understand what it means. I think that the word material is used in this context has to be understood in light of what the second substrate is. And we know from the claim language that the second substrate is a thing. It's not simply a raw material. We know it's a thing that has the following four other characteristics. It's got array locations. It's got discrete sites on projections. And in those discrete sites, you've got bioactive agents. So it's a component. We know that. We look to the definition to understand, well, what is that component? What's the definition of this thing, this second substrate? And the definition tells us that it's a material that can be modified to have discrete sites appropriate for the attachment or association of beads and is subject to one detection method. So first of all, you have to understand that as a thing because that's what it is in the claims. But there's three other reasons that I'd like to put out why it makes no sense at all to view it as simply the raw material. Firstly, if it were simply the raw material, there's a real question of why it would even be there. Because if you were going to then produce a final product, if the claimed final product not only doesn't have beads but never was supposed to have beads and never could have beads, then it would be very odd to read the definition of the substrate as something that can be modified to have beads. You just wouldn't care whether the raw material could have been made into something else. Our interpretation, which is that the substrate is something that either is going to have beads, makes sense of that limitation in the definition. It's a temporal thing, right? I mean, because can be modified is astronomically, it's quite broad. Certainly, Your Honor. Capable of being modified. And so you need to impose the temporal limitation. If not, you've got a problem on infringement. That's exactly right, Your Honor. And certainly what it doesn't mean is could have been in one time during the chain of production. Right. So you then look to the claim language and say, well, no, in the context of claim language, we're looking at the structure with the ray plates and all of that. Exactly. And one of the characteristics of it is that it can be modified. And in some circumstances it already has, in some circumstances it could be modified into. So you ask the question, can it be modified at what juncture? That's right, Your Honor. And it has to be able to be modified in the form in which it's The second reason why I think it makes it... In looking at that, shouldn't we be adopting the more narrow construction as possible? Your Honor, I do think that athletic alternatives in the cases that follow it suggest the most narrow construction possible, Your Honor, rather than the broadest. And I think if you're looking for what the raw material could have been made into, it's awfully broad. In fact, let's face it, everything we can think of could conceivably, in terms of raw materials, be made into something that has discrete sites that could have beads. I mean, you could freeze water into ice, for gosh sakes, and you could do that with it. So if their meaning were correct, that it's just the raw material, they might as well just stopped at substrate is meant, by substrate is meant a material. Because everything that follows it that says a material that can be modified in a certain way is going to be true of just about every material we can possibly think of. They pretty much say that. They say that it's the number of possible substrates is very large, and they go on and say it could almost include anything, including, and then they go on naming some of those, and the first one they name is glass. Your Honor, and I would agree that the things that a substrate can be made out of are going to be very large. No question about it. But the substrate itself is a structure, and that structure has to be able to be modified in a certain way. Now, if I may, just the fourth reason, and I think this may be a clincher for you, is that if it means the raw material, it presupposes that there's a single raw material for the entire substrate. That's what it would have to presuppose. But let's think about what a substrate is, because the claim language tells us that you've got the array locations on project, I mean, you've got an array location comprising projections that have discrete sites on them, and then you've got bioactive agents. Let's take our accused product as an example. Our accused product has a base that can be made out of anything you'd like, I guess. You can look at a picture of this at 796 of the JA. It's got a base. On top of that base, you've got projections or pegs. They're made out of plastic. We know that from their expert, his reports at docket 175, page 42. So the pegs are made out of plastic. On top of those pegs, we know that we've got a glue layer, and on top of the glue layer, we've got glass wafer, and on top of the glass wafer, we've got silane, and on top of the silane, we've got linker. So if it means the raw material out of which the substrate is made, and that's all it means, well then the question is, what raw material are we even talking about? I submit that they're talking when they say material about the whole thing, and once you understand it that way, it's quite clear that our product doesn't infringe. Why would one construe then that we're talking about raw material that must be modified to include beads? That can be modified to include beads. Your Honor, I don't construe it that way. In other words, I construe it as the final product has to be able to be, the component itself has to be able to be modified to include beads. And in our case, ours can't. There's, we've got two witnesses. Modified to be capable. Modified to be capable of, modified to be capable of having, or can be modified to have discrete sites appropriate for the attachment or association of beads. We've got two witnesses who have testified without contradiction on our side. One was the head of our R&D, Goldberg, and the other one was our expert witness, Sharon, who both testified that with our final product, it can't be modified because you've got a uniform layer of, you've got probes on a uniform sheet all the way across it, synthesized, that you can't modify that to include beads without destroying it. Now, I think there's an important thing for me to note here. This is the final, that you can't modify it once you get up into the wafer part, or can you modify the glass part to include beads? It's the very first. Well, the very first part, Your Honor, is just a base of the unit. And then you've got projections. Can you modify that to include beads? Well, just like you can modify any raw product, you can melt it down, presumably, and do it. But at that point, again, I think we're rendering the meaning insignificant. Well, I think it's... Well, I think you've answered it. I mean, that's a tough question. I mean, I struggle with that question, is your answer that the claim languages have these other limitations, claim two has all of this stuff about arrays and so forth, and so you're not looking at the raw material in isolation at that point in time? That's exactly right, Your Honor. You're looking at the entirety, because when you look at the claim language, they're clearly not talking about raw material when they say a second substrate, because they say what it comprises. And it comprises all of these various things. It's clearly the finished component in a two-component system. Now, I think it's important for me to lay this out, by the way, that there are systems that are non-beaded systems that could be used, could be modified to have beads. It's not the null set. You know, we know from... When we look at Column 9 of the specification, that you can use binding ligands, which are defined in Column 17, to be equivalent to bioactive agents. You can use them to attach beads. We also know from Column 6 that a bioactive agent can both attach a bead and attach something else. In Column 6, it talks about attaching a decoding agent. There's no reason whatsoever, then, that you couldn't have a system that has bioactive agents that can directly bind with an analyte, and at the same time, can attach a bead to it. So that would be a system that you could sell, presumably, if you wanted to give someone optionality, where they could use it as is, or they could add beads to it, and adding beads to it would give it the ability to detect perhaps two different things, an antibody or a DNA strand, depending on what you want to be able to detect. So the point being, you can tell even from their specification itself that you can have systems with optionality, and you can have systems that are either beaded or those that could be beaded. If I may, I can, if you have more questions about this, I'd be happy to address them. And if not, I'll go on to the... We'll proceed. You may use the time... Thank you, Your Honor. Just wanted to make sure I wasn't preempting any questions. Bioactive agent, I think, is an awfully easy one, and one that the district court got clearly right. You know, once again, the district court looked at the definition that is given in the document, and I submit that when, as here, as in column five, when we're talking about substrate, when the patentee uses the term, by X is meant Y, the public does have the right to take the patentee at its word, that it is defining. And here, on the patent he was defining, bioactive agent is any molecule that can attach to a bead. And the key here, of course, is it doesn't have to attach to a bead, but it can. And so interpreting that definition in that way is fully consistent with interpreting substrate the way that we have suggested. Both of them allow for beaded systems or systems that could be used with beads. And there's absolutely no reason that I've heard so far why bioactive agent can't be interpreted that way. And certainly the fact that it can be directly coupled, as we just discussed, when you look at column nine, we agree that a bioactive agent can be directly coupled to a surface. There's no question about that. Yet it could still be used on its own, or perhaps with beads, depending on how you want to do that. Finally, discrete sites. The court below correctly recognized, when you look at column eight, that that's where you get the best understanding of what the term means. Because in column eight, first the patentee discusses what is the second substrate that it has in mind, or the patentee has in mind, which is you've got a modified surface that has discrete spots in which you later associate bioactive agents. And it uses that word later. By the way, just as the definition of substrate does, where they say you've got a material that can be modified to have discrete sites that are appropriate for the association or attachment of beads. So the discrete sites is a separate thing. It exists independent of the bead itself. We know that from those two passages. The next passage on column eight tells us that sites may not be discrete. In other words, it's telling us there's a potential other embodiments or other ways you can do this, not claimed, but that you can do this, that don't have discrete sites. And what it tells us about that is that you can have a uniform layer, for example of adhesive, where beads can end up at individual sites that may or may not be contiguous. So that tells us that a discrete site is being associated with non-contiguous, and then not discrete site is a contiguous site. But the only argument otherwise really goes to the last sentence of column eight that we've seen. And that last sentence of column eight actually means nothing of the sort that my friend says it means. If you look at the sentence, it says, thus the surface of the substrate may be modified such that discrete sites are formed that can only have a single associated bead. What that actually means is a targeted association between a particular bead and a particular site. Column six talks about this. They talk about positional identification. It's one way of knowing which bead has gone where is you put it in a particular site. The next part of the sentence tells us, or alternatively, the surface of the substrate is modified and beads may go down anywhere but end up at discrete sites. Well, as the district court found, that just means you put the beads down and they end up in sites that are discrete. One way of thinking about this might be a Chinese checkerboard. You take the marbles, you put them down on the Chinese checkerboard, and they end up in the indentations or the wells. That would be another way of doing it. Can you read that also to understand that the surface of the substrate can be modified so that discrete sites are formed that have no beads? Oh, certainly. I'm not saying that it has to be beads, Your Honor. I think you could have non-beaded discrete sites. Before your time runs out, can I just ask you my own edification? Of course, Your Honor. This case from beginning to end seems to have taken only 13 months. And there were inventorship questions, and there were several claim construction. It seems very quick. Was there anything peculiar about this case that required its expedited handling? Or is this just how quick Wisconsin is? My understanding, Your Honor, is that I guess it was 18 months I'm now hearing. And my understanding, Your Honor, is that other than the Eastern District of Virginia, the district court in Virginia, I mean, in Wisconsin, does move quickly. I don't think that that's a bad thing. I actually think it's a lot of it. No, I think it's a great thing. That's why I noticed it. Terrific. Judge Crabb is very efficient. Yes, she is, Your Honor. Thank you very much. Okay. Thank you, Mr. Bress. Mr. Custodius. I didn't mean to limit that question to them, so if you had a comment about that, it was just an observation. No, no, I think, uh, I think Mr. Bress is right. The court in Wisconsin does move fairly fast. It's a fairly attractive venue for patent donors, and in fact, you'll see in various blogs and newswires that Judge Crabb issued, or actually through her magistrate judge issued an order earlier this week indicating that she's no longer going to have individual Markman hearings. She's going to go right to summary judgment and have claim construction in that connection as well. Let me address the substrate issue first. I feel, both in the briefing and in the argument here, like I'm playing a little bit of a whack-a-mole game like at the old state fairgrounds with the argument on the other side. Our point is not that the definition of substrate is it's the raw material. That's not the definition for the claim. Our definition is support. That's the definition we offer. That's the one we think is the more appropriate one. The problem is that that so-called definitional language is not definitional at all. It's about the raw materials. It's about the raw pre-modified materials. And then what happens when you get to the claims is you have claim language, as you pointed out, Judge Reyna, that require all of these other things to happen to the raw material. And what my friend and his team did on summary judgment to us is they got this raw material construction as the definition and then said, oh, well, you can't modify ours because ours is not the raw material. Ours is this completely cooked substrate, and if you add a bead to it, it would completely destroy it. So our point is either if you're going to use the language in column 7 as a definition, then limit it to a definition of the raw materials that are being used. If on the other hand, you use the correct construction, which is support, then we have questions of fact with regard to whether that support in their product meets the limitations of the claim, which are those four things that Mr. Bress pointed out. He says repeatedly, the substrate is a structure, and the structure has to be made in a particular way. With regard to the claims, we agree with that. With regard to what's at column 7, that's not what column 7 is talking about. They don't fit together in the way that the district court tried to make them fit together, which is the fundamental error. The column 7 language is pre-modification. The claim language is post-modification. They don't fit like that. With regard to the comment that the language is meant, is a definition on which the public is entitled to rely, I'd point Judge Proch to your opinion for this court in Fizer versus Teva, where the patentee used a very similar term, i.e., also meaning that is, yet the court said that in the context of the entire specification, that was not a definition that was used in that case. Finally, with regard to discrete sites, my friend on the other side will not embrace the ordinary meaning of discrete. The ordinary meaning, as it appears in the claims, is not contiguous. It is, if you look at dictionaries, if you look at the way that ordinary people use the term discrete, it means independent or separate in the way that we've described it as sufficiently distinct to permit individual detection. And if there's any proof of that, there's this intrinsic evidence, which appears at page 55 of our opening brief, which is another patent which is referred to in the specification of the patent, which is a checkerboard. And each of those spots, each of those individual squares, is supposedly a discrete site. But they touch each other. The sites touch each other. What should matter for purposes of detection is that the beads or the microspheres or the substances that are being detected are sufficiently separated from each other to be able to be detected by the optical detection system. Not that these sites themselves have to be non-contiguous. That's not what the prior art says. It's not what this patent says. It's not what the dictionaries say. And the court's effort to try to tease some meaning out of that language that's appearing in Column 8 is certainly not sufficiently clear to constitute a definition, a clear disclaimer, a limitation of the invention, or anything like that. For the reasons we've set forth, we think that the judgment should be vacated, the case remanded under a proper claim construction. Of course, if the court has any further questions, I thank you for your time. Any more questions? Any more questions? Thank you, Mr. Castanis and Mr. Bress. The case is taken under submission. All rise. Thank you. Thank you.